## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DREILING MILLENNIUM TRUST II,** a Florida Trust, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| **RELIANT RENAL CARE, INC.,** a Delaware Corporation | ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

Dreiling Millennium Trust II ("Dreiling"), by and through its undersigned attorneys, Dechert LLP, states as follows for its complaint against Reliant Renal Care, Inc. ("Defendant"):

### Summary of Claim

1.     Defendant is being sued for its intentional and self-serving interference with Dreiling's contractual relations.  Dreiling is a 50/50 joint venture partner with two physicians (the "Doctors").  In early 2009, Dreiling and the Doctors, along with other owners of its dialysis centers, entered into negotiations with Defendant for the purpose of selling to Defendant five (5) dialysis centers that are located in Pennsylvania.  In July 2009, the negotiations culminated in the signing of Term Sheets for each of the five (5) dialysis centers.  After signing the Term Sheets and after Dreiling granted Defendant access to its confidential joint venture agreements and other confidential financial information, Defendant informed Dreiling that it would only proceed with the transaction under drastically different terms.  Dreiling informed Defendant that the new terms were unsatisfactory and the negotiations were terminated.  Subsequently, Defendant tried a new tactic.  It approached the Doctors and began advising them on how to use the terms of the joint venture agreement in order to artfully create an impasse in an attempt to trigger a buy-sell

provision in Dreiling's agreement with the Doctors, whereby Dreiling would be forced to either sell its entire share in the Pennsylvania Dialysis Clinic of Reading, Inc. ("PDCR") or to purchase the Doctors' shares. Defendant has engaged in this nefarious conduct with the intent of driving a wedge between Dreiling and the Doctors and leveraging the results of such conflict into an acquisition of all or some of Dreiling's dialysis centers.

## The Parties

2.      Plaintiff Dreiling is a trust organized under the law of the State of Florida. Dreiling owns dialysis centers, which provide comprehensive dialysis services to patients with end stage renal disease.

3.      Defendant is a corporation that is formed under the law of the State of Delaware. Defendant is an investor in, and operator of, dialysis centers and seeks out dialysis centers that it believes are strong acquisition candidates. Defendant has its principal place of business at 1400 North Providence Road, Building II, Suite 1040, Media, Pennsylvania 19063.

## Jurisdiction and Venue

4.      Jurisdiction is appropriate under 28 U.S.C. § 1332, because there is complete diversity of citizenship and because the amount in controversy exceeds $75,000. Specifically, Dreiling is a Florida trust and Defendant is a Delaware corporation with its principal place of business in Pennsylvania. The amount in controversy, including both the injunctive relief and damages that are sought, is in excess of $75,000.

5.      Venue is appropriate because Defendant resides within the Eastern District of Pennsylvania and because a substantial part of the events giving rise to this litigation occurred in the Eastern District of Pennsylvania.

### The Formation of the PDCR and the Buy-Sell and Voting Agreement

6.     The PDCR was incorporated in the State of Florida in 1985 and was intended to

operate an outpatient dialysis facility in Wyomissing, Pennsylvania.  Pursuant to a 1985

Agreement, the Doctors were provided with an opportunity to acquire a fifty (50) percent interest

in the PDCR, which the Doctors exercised in 1986.

7.     On March 27, 1987, Albert Dreiling, (the predecessor to Dreiling) and the

Doctors entered into a Buy-Sell and Voting Agreement (the "Voting Agreement"), which was to

govern the future transfer of shares in the PDCR.

8.     The Voting Agreement placed specific restrictions on the right to transfer shares

and also outlined the permissible methods for transferring shares.

9.     In addition to the restrictions on the transfer of shares, the Voting Agreement

included an Impasse provision, which was intended to govern scenarios in which the PDCR's

owners became deadlocked and could not agree on an issue affecting the affairs of the

corporation.  At no point during the over 23 years that the Voting Agreement has been in effect

has any party declared an impasse.  In fact, Dreiling and the Doctors have spent the past 23 years

building a successful dialysis facility providing needed care to the patients of the PDCR.

### The Term Sheets

10.     Dreiling is a part-owner of multiple dialysis centers, including the PDCR, Renal

Care of Oil City, Reading Dialysis Center, Renal Care of Clarion, and (until recently) Renal Care

of White Oak (collectively, these five centers will be referred to as the "Facilities").

11.     Dreiling co-owns these facilities with multiple physicians.  Notably, Dreiling co-

owns the PDCR and the Reading Dialysis Center with the Doctors.

12.     Early in 2009, Defendant approached Dreiling regarding Defendant's potential

acquisition of its centers.  Shortly thereafter, Dreiling began negotiations with Defendant

regarding the potential sale of the Facilities to Defendant. During the course of the negotiations Dreiling provided Defendant with confidential information regarding the business operations of the Facilities.

13.     In or around June 2009, the negotiations between Dreiling, its physician co-owners, and Defendant culminated in the signing of separate Term Sheets for the sale of each of the Facilities. Each Term Sheet pertained to an individual dialysis center, but the negotiations between Dreiling and Defendant pertained to Defendant's acquisition of all of the Facilities. The sale price for each of the Facilities was set based upon the understanding that the transaction would involve all of the Facilities.

14.     The Term Sheets provided for a due diligence period, which permitted Defendant to provide Dreiling with a final valuation of the assets and, in the event Dreiling chose not to accept such valuation, allowed Dreiling to terminate the Term Sheet and thereby end the parties' obligations under the Term Sheets.

### Defendant Alters the Terms

15.     In or around October 2009, after conducting protracted due diligence, Defendant informed Dreiling that it would have to dramatically alter the Term Sheets in order for Defendant to complete the acquisition of the Facilities.

16.     Dreiling was not interested in selling the centers pursuant to Defendant's amended terms and informed Defendant that it would not complete the transaction under those terms. Accordingly, both Dreiling and Defendant's obligations pursuant to the Term Sheets ended.

### Defendant Schemes with the Doctors

17.     Due to Dreiling's decision not to complete a drastically altered transaction, Defendant came up with a new strategy. First, apparently based on the information that it

learned during due diligence, Defendant sought a way to cherry-pick the best of the Facilities, by forcing Dreiling to complete the hoped for sale of PDCR, which is by far the most valuable and profitable of the Facilities, to Defendant.

18.     Defendant intended to acquire in excess of fifty (50) percent of the PDCR and therefore required that a portion of Dreiling's interest be included in any deal.  In order to accomplish this goal Defendant had to drive a wedge between Dreiling and the Doctors to ensure that Dreiling would be forced to sell its interest in the PDCR.

19.     Upon information and belief, in or around March 2010, Defendant contacted the Doctors to discuss a purchase of the PDCR and to discuss methods by which Defendant could force Dreiling to sell its share in the PDCR.

20.     Upon information and belief, Defendant, acting through its Chief Executive Office, Barbara Bednar, proposed a scheme in which the Doctors would leverage Dreiling into completing a sale transaction with Defendant pursuant to Defendant's terms.  The leverage for the scheme was provided by the impasse provision in the Voting Agreement (which was part of the confidential information that was provided to Defendant during due diligence).

21.     Upon information and belief, in light of its concern that Dreiling would be unwilling to sell a sufficient portion of its ownership in PDCR, Defendant concocted a plan whereby the Doctors would declare an impasse under the Voting Agreement, which would provide them an opportunity to utilize the buy-sell provision in the Voting Agreement and thereby sever the Doctors' relationship with Dreiling.  Despite the absence of any legitimate impasse, Defendant's scheme, if effectuated, would result in Dreiling being confronted with a Hobson's choice between making a decision during the limited timeframe set out in the buy-sell provision and risking a lawsuit from their longstanding physician partners.

22.     During the time period in which it is believed that these conversations were taking place between Defendant and the Doctors, the PDCR was operating with business as usual, providing good care to its patients and operating profitably.

### Correspondence between the Doctors and Dreiling

23.     Pursuant to the scheme to manufacture an impasse and force Dreiling to sell, on March 23, 2010, the Doctors sent a letter to Dreiling, informing Dreiling that they were still interested in pursuing a sale of the PDCR to Defendant.  The Doctors informed Dreiling that they were in favor of completing a transaction with Defendant pursuant to the Defendant's amended terms and also informed Dreiling that they would invoke the impasse provision if Dreiling refused to resume discussions with Defendant.

24.     On March 31, 2010, acting on behalf of Dreiling, Judy Lease responded to the Doctors' letter.  In the March 31, 2010 response, Ms. Lease, without knowledge of Defendant's tortious actions, explained that Dreiling was willing to pursue several options to ensure the success of the PDCR.  Those options included:  (1) a sale to Defendant of at least a 51 percent interest in the PDCR under the financial terms provided in the Term Sheet with Dreiling selling a ten (10) percent interest in the PDCR as part of the transaction; (2) a sale of both the PDCR and the Reading Dialysis Center as part of an open auction; and (3) a restructuring of management under the current ownership.

25.     On April 7, 2010, the Doctors responded to Ms. Lease's March 31, 2010 e-mail. The Doctors included an offer pursuant to which Dreiling would sell a twenty (20) percent interest in PDCR and its entire interest in the Reading Dialysis Center, and would be required to agree to a drag-along provision regarding the PDCR under which the majority owners in the PDCR could agree to a sale of all of the equity of the PDCR without obtaining Dreiling's consent.

26.     Dreiling has been unable to reach any resolution with the Doctors, and, upon information and belief, Defendant is still encouraging the Doctors to declare an impasse despite the fact that the potential sale of the PDCR does not affect the operations of the company and despite Dreiling's efforts to engage in good faith negotiations with the Doctors.

## COUNT I:  INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

27.     Dreiling re-alleges paragraphs 1 through 26 and incorporates them by reference as though fully stated herein.

28.     The Voting Agreement is a binding and enforceable contract between Dreiling and the Doctors.  Dreiling and the Doctors have been operating the PDCR pursuant to their contractual relationship for over 23 years.

29.     Upon information and belief, Defendant has taken action to disrupt the contractual relationship between Dreiling and the Doctors.  Specifically, Defendant has engaged in communications with the Doctors regarding the triggering of the impasse clause in the Voting Agreement and has encouraged and directed the Doctors to fabricate an impasse.  Defendant's intent is to sever the contractual relationship between Dreiling and the Doctors through the operation of the buy-sell provision that is contained within the impasse clause.

30.     Upon information and belief, Defendant also intends to acquire an interest in the PDCR after it has succeeded in severing the relationship between Dreiling and the Doctors.

31.     No privilege or protection justifies or permits Defendant's conduct inasmuch as that conduct is intended to interfere with the contractual relationship between Dreiling and the Doctors and to destroy a longstanding and successful partnership.

32.     As a result of Defendant's intentional interference with Dreiling's contractual relationship with the Doctors, Dreiling has suffered, and unless Defendant's conduct is enjoined,

will continue to suffer damages through the diminution in value of the PDCR through the discord that Defendant has created and that currently exists amongst the owners of the PDCR. Furthermore, if Defendant's conduct is not enjoined, Dreiling will be damaged through its inability to pursue a sale of the PDCR on the open market.

33.     Furthermore, Defendant's interference with Dreiling's contractual relationship with the Doctors has also caused harm, and unless Defendant's conduct is enjoined will continue to cause harm, through the diminution in value of the Reading Dialysis Center, LLC, which is owned, in part, by Dreiling and the Doctors and which is impacted by the discord that Defendant is causing.

## PRAYER FOR RELIEF

WHEREFORE, Dreiling respectfully requests that this Court enter judgment in its favor and against Defendant and award Dreiling the following relief:

(a)     a preliminary and permanent injunction enjoining Defendant from its wrongful conduct and from engaging in any further discussions or activities that interfere with Dreiling's contractual relations with the Doctors, including soliciting or discussing the sale of the Doctors' shares in the PDCR or discussing the possibility of the Doctors declaring an impasse under the Voting Agreement;

(b)     monetary damages to compensate Dreiling for its damages suffered as a result of Defendant's wrongful conduct alleged herein;

(c)     costs associated with this lawsuit; and

(d)     such other and further relief as this Court deems just and proper.

## JURY DEMAND

Dreiling respectfully requests a trial by jury.

Dated: April 30, 2010

Respectfully submitted,

DREILING MILLENNIUM TRUST II

By: _Robert Heim / AB_____
         One of Its Attorneys

Robert C. Heim
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994 4000 -- telephone
(215) 994 2222 – facsimile

Of Counsel:

Jeffrey C. Clark
McGuireWoods LLP
77 W. Wacker Drive, Suite 4100
Chicago, IL  60601
(312) 750-8636 – telephone
(312) 920-7230 – facsimile

\11095787.6